Filed 3/8/24  In re N.S. CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

|  |  |
|---|---|
| In re N.S., a Person Coming Under the Juvenile Court Law. | |
| TULARE COUNTY HEALTH AND HUMAN SERVICES AGENCY,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>RANDY S.,<br><br>Defendant and Appellant. | F087157<br><br>(Super. Ct. No. JJV068482E)<br><br>**OPINION** |

### THE COURT[*]

APPEAL from an order of the Superior Court of Tulare County.  Sylvia J. Hanna, Judge.

Jacob I. Olson, under appointment by the Court of Appeal, for Defendant and Appellant.

Jennifer M. Flores, County Counsel, and John A. Rozum and Jason Chu, Deputy County Counsel, for Plaintiff and Respondent.

-ooOoo-

---

[*]       Before Levy, Acting P. J., Franson, J. and DeSantos, J.

Randy S. (father) appeals from the juvenile court's order terminating his parental rights as to his minor daughter, N.S. (Welf. & Inst. Code,[1] § 366.26). He contends the court erred by (1) denying his oral motion for a continuance of the section 366.26 hearing and (2) declining to apply the beneficial parent-child relationship exception to termination of parental rights (§ 366.26, subd. (c)(1)(B)(i)). Finding no error, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

In April 2021, the Tulare County Health and Human Services Agency (agency) filed a juvenile dependency petition on behalf of then four-month-old N.S., alleging she came within the juvenile court's jurisdiction under section 300, subdivisions (b)(1) and (j). It was alleged the parents were unable to protect N.S. from harm due to domestic violence and substance abuse. It was further alleged that mother[2] neglected N.S.'s siblings, failed to reunify with them in previous dependency proceedings, and placed N.S. at similar risk.

At the detention hearing conducted on April 13, 2021, the juvenile court found father was N.S.'s presumed father. The juvenile court ordered N.S. detained from the parents. Father was granted three two-hour supervised visits per week, with the agency having discretion to increase the length and frequency of the visits.

N.S. was placed with a relative care provider, her paternal cousin. Father began participating in voluntary services. In May 2021, N.S.'s care provider reported N.S. appeared to be more subdued and quieter for about two hours following visits with the parents before brightening up and interacting normally with the care provider.

---

[1]    All further undesignated statutory references are to the Welfare and Institutions Code.

[2]    Mother is not a party to this appeal, and to our knowledge has not appealed separately. We omit facts pertaining to her not relevant to the issues presented in this appeal.

At the combined jurisdiction/disposition hearing conducted on May 21, 2021, the juvenile court found the allegations set forth in the petition true and that N.S. was described by section 300, subdivisions (b) and (j). N.S. was removed from the parents' custody, and both parents were ordered family reunification services. The visitation order remained the same, with the agency having discretion to increase the length and frequency of the visits or to allow unsupervised or overnight visits after consultation with N.S.'s attorney.

At the six-month review hearing conducted on November 16, 2021, the juvenile court continued reunification services for the parents. Visits were reduced to two times per week for two hours due to the parents' inconsistency with visitation and difficulty visiting at the same time due to problems in their relationship and domestic violence.

Following the six-month review hearing, the parents visited N.S. separately. The quality of visitation improved, and concerns decreased. Both parents were reported to stay engaged with N.S. throughout the visit. It was further reported that N.S. experienced difficulty adjusting upon being dropped off by the care provider, and the parents would spend the first half of the visit working to comfort N.S. There were several reports of N.S. crying throughout visits with father. The agency wanted to submit a referral for mental health therapy to address the crying, and father willingly signed the necessary paperwork.

Father completed a residential substance abuse program and began participating in aftercare. He had completed about half of his recommended batterer's intervention program, as he had been previously discharged due to excessive absences.

At the 12-month review hearing conducted on June 14, 2022, the juvenile court continued the parents' reunification services, finding a substantial probability that N.S. would be returned to them within six months, as they had consistently and regularly visited N.S., made significant progress in resolving the problems that led to removal, and

demonstrated the capacity and ability to complete the objectives of treatment and provide for N.S.'s well-being. The visitation order remained the same.

In June 2022, N.S. was referred to mental health services, and it was determined she met medical necessity for treatment due to her "ongoing tantrums and due to [N.S.]'s history of trauma (domestic abuse and neglect[)]." N.S.'s care provider reported to the clinician that N.S. appeared to be "fearful/scared and struggles with transitions during visitations." N.S. would engage in self-harm behaviors such as slapping and scratching herself. Services were recommended "in order for [N.S.] to establish and maintain a bond with primary caregivers, while learning to co-regulate resulting in reduction of anger outbursts, and to terminate self-harm behaviors." The clinician planned to incorporate father into services. The clinician spoke to the care provider about the language she used surrounding visits and suggested she tell N.S. she was going to "play with daddy" rather than go for a visit. The clinician reported to the social worker she planned to provide ideas to father to make N.S. more comfortable at visits such as bringing the same blanket or toy to visits.

It was reported mother was taken into custody with no release date and was facing multiple felony charges, including attempted murder, and was unable to make any further progress on services. Mother gave birth to a child in July 2022 for whom dependency proceedings were initiated, and mother was denied services. It was expected N.S.'s half sibling would be placed in the same home as N.S.

Father continued working on his services but was homeless and working on securing appropriate housing. In September 2022, N.S.'s CASA relayed concerns to N.S.'s attorney regarding father's frequent requests for unsupervised visitation. She reported concerns because N.S. continued to express "anxious-like" behavior following visitation. As of October 2022, father reported seeing benefits from N.S.'s therapy as visitation had improved.

In its 18-month status review report, the agency noted father had made progress in services but did not have appropriate housing. It was further reported that "[d]ue to concerns regarding [N.S.]'s behavior before and after visitation, … father and [N.S.] have been unable to successfully transition to unsupervised and overnights to safely return [N.S.] to … father's care."

In a caregiver information form filed by N.S.'s care provider in October 2022, N.S.'s care provider reported that visitations were "hard on [N.S.]." The care provider stated N.S. "takes alot of coaxing in the morning to get ready" and upon returning from visits, she was "emotional and whinny" with "meltdown[s]" and crying that normally went on for a day and a half after visitation.

On October 4, 2022, the court ordered father's visitation to increase to six hours per week. The social worker subsequently reported father came prepared to visits with diapers, blankets, toys, snacks, and water for N.S. Father was observed to be engaged and appropriate with N.S., but at times N.S. was reserved and would ask for her care provider.

The social worker further reported father was "thoroughly engaged in [N.S]'s mental health services" and as of November 2022 was set to begin conjoint family therapy with N.S. every other week. Father had secured housing to be available in December and was testing negative for substances. He was meanwhile awarded custody of his two older children in a family court proceeding.

Meanwhile, mother was released from custody with an ankle monitor awaiting trial, but the agency had difficulty making contact with her upon her release.

At the 18-month review hearing conducted on November 8, 2022, the juvenile court terminated services as to mother and continued them as to father, finding a substantial probability N.S. would be returned to father within the next six months.

Father continued to visit with N.S., and the visits were observed to be appropriate. The social worker reported father and N.S. enjoyed visits and "continue[d] to create a

bond." N.S. seemed comfortable and excited to see father. Father continued to comply with random drug testing and had almost completed his batterer's intervention program but still struggled with securing housing as his previous housing plan had "fallen through." There were also concerns because father appeared to be trying to reconcile with mother.

Father later reported to the social worker that he had spoken to the care provider, and they agreed that legal guardianship was appropriate. He did not want to lose his parental rights and wanted to continue visiting with N.S. but wanted to have a job and driver's license before regaining custody of N.S.

N.S.'s therapist provided a report dated February 2023 that indicated N.S. demonstrated as "responsive and engaged" and "in a happy mood" during family sessions.[3] It was further reported the care provider and father were responsive to collateral sessions and were receptive to psychoeducation, intervention modalities, and positive parenting skills. N.S.'s crying outburst behaviors had decreased in length, and the frequency of hair pulling and hitting herself had decreased.

On the date set for the 24-month review hearing, April 28, 2023, father's counsel indicated father was no longer willing to agree to a legal guardianship because he had secured housing and was planning on moving in following the hearing. Counsel requested a continuance of a couple of weeks so the social worker could confirm father's housing. Minor's counsel added that visits had not progressed to unsupervised because N.S. continued to have behavioral issues before and after visitation. The court asked the care provider, who was present, if she had a concern about unsupervised visits. She responded, "I don't have a concern with him not being able to take care of her. My only

---

[3]     The record is unclear as to how many "family sessions" with father had occurred. The report indicates father and N.S.'s care provider participated in family sessions, but in March 2023, father indicated he had only had one family session, and at the section 366.26 hearing, he testified they never began.

concern would be how she reacts to it. Right now, when we go to a visit, I do tell her, because it's sometimes hard to get her to go, that she's going to go play with dad. If I just say you're going to a visit, she will tell me no and start crying. She will try and remove her clothing as I'm getting her dressed. Once we get to the visit, she's okay to stay with dad." The matter was set for a contested hearing.

N.S. got a new therapist, as her previous therapist left the agency, and in May 2023, N.S.'s new therapist informed the social worker she had her first session with N.S. on April 20, 2023. She would be meeting with N.S. every other week and had scheduled collateral phone calls with father. Father wanted to start family sessions, but the clinician informed him she needed to have more sessions with N.S. to determine if she was ready for family sessions. She further noted to the social worker she would be unable to provide feedback as to whether she believed N.S. would be ready to be returned to father's care because she had not worked with N.S. long enough.

The social worker visited father's home where he and his older son were present. The apartment was observed to be well-furnished and neat. Father and the social worker discussed father's plans for providing care to N.S. including transportation and daycare.

At the contested 24-month review hearing conducted on June 2, 2023, the juvenile court found it would be detrimental to return N.S. to father because N.S. had special medical needs that it was not clear father could meet, N.S. had a significant attachment to her care provider, and there were "significant" issues between father and N.S. that prevented them from progressing beyond supervised visits. The court terminated father's reunification services and set a section 366.26 hearing.

In a caregiver information form filed in September 2023, the care provider stated N.S. still struggled with visitation and said she did not want to go. She "constantly" asked the care provider if she was her mom. The care provider further stated that N.S. should stay with her because "[t]his is all she knows" and "[s]he emotionally could not handle being removed from us[;] she hardly handles daycare or visits." The care provider

added that she was concerned with the parents not respecting N.S.'s boundaries by continuously asking for a hug or kiss goodbye or forcing one on her when she says no. She further stated N.S. did not ask for the parents when she was not with them.

The agency's section 366.26 report dated September 13, 2023, recommended parental rights be terminated and adoption with N.S.'s care provider be selected as her permanent plan. The report indicated the parents were consistent with visits but that N.S. was observed to not fully engage with them, would ask to go home, or would not allow the parents to hold or hug her. N.S. did not appear excited to see the parents and on occasion asked to go back to the care provider. N.S. had been placed with her care providers since she was five months old and called the care provider "mom." The care provider was also in the process of adopting N.S.'s younger sibling. As of October 2023, N.S. was still expressing she did not want to go to visits with the parents.

The section 366.26 hearing was conducted on October 17, 2023. When asked if father was prepared to proceed, father's counsel stated, "Well, your Honor, I was speaking with my client. He told me a couple of things that I was not aware of for today as far as [N.S] as to her counseling that she was getting. Apparently that was counseling that was supposed to be done to help her and father relate to each other in visitation, but I didn't realize that this counseling had been counseling [*sic*] back in April. So wanted to get more documentation of that. So I'd ask for another brief continuance of this so it would make a difference as to whether the Court follows the recommendation." Both counsel for the agency and minor's counsel objected to a continuance as the counseling was not relevant to the issues of the section 366.26 hearing. When father's counsel stated it would be relevant to the application of the beneficial parent-child relationship exception, the court responded, "But aren't we looking at current parent-child relationship?" The court denied the request for continuance "for that purpose given the objections."

Father testified that he lived with N.S. from the time she was born until she was five months old. Visits were going really good. During visits they played and bonded, but the new place they have had visits for the past two months has been different because they do not have anything "that's appropriate for kids." He and N.S. sometimes watched movies together. Sometimes early in visits, N.S. had trouble because she might be having a bad day and was very aware that there is not a lot of privacy at the visitation center, but once she got settled in, she would sit on father's lap. They would laugh and tell stories and talk about mother when she was not there.

Father further testified that when he met with N.S.'s first therapist, the treatment plan was to have sessions with N.S. and father so the therapist could see how they interacted. The treatment "didn't make it that far" because a meeting was never conducted to progress to that point and the therapist got a different job and N.S. got a new therapist. Father testified it would be detrimental for the court to terminate parental rights because N.S. loves her parents.

N.S.'s care provider testified that N.S. asked for the parents about once a week, but asked more frequently about mother than father. After some visits, she would be excited to talk about her visits; but after other visits, she became emotional and cried. When asked if she thought N.S. missed the parents, she responded, "I would say at points, yeah. I mean, I don't think she really understands to be able to say that she verbalizes that she does," but she thought N.S.'s demeanor and actions showed that she missed the parents. When asked if the parents were unable to see N.S. anymore would it be detrimental to N.S., the care provider responded, "I think if they completely shut them out of her life that it would, yes."

Both parents argued the beneficial parent-child relationship exception to termination of parental rights applied. Minor's counsel and the agency argued the court should follow the agency's recommendation to terminate parental rights.

The court found that N.S. was adoptable and the beneficial parent-child relationship exception to termination of parental rights did not apply. The court terminated parental rights and ordered adoption as N.S.'s permanent plan.

## DISCUSSION

### I. Denial of Father's Oral Motion to Continue the Section 366.26 Hearing

Section 352 provides that upon request, the juvenile court may continue a dependency hearing beyond the time limit within which the hearing is otherwise required to be held so long as it is not contrary to the interest of the minor. (§ 352, subd. (a)(1).) "In considering the minor's interests, the court shall give substantial weight to a minor's need for prompt resolution of his or her custody status, the need to provide children with stable environments, and the damage to a minor of prolonged temporary placements." (*Ibid*.) "Continuances shall by granted only upon a showing of good cause and only for that period of time shown to be necessary by the evidence presented at the hearing on the motion for the continuance." (*Id*., subd. (a)(2).) Written notice of a motion for a continuance must be filed at least two court days prior to the date set for hearing, with affidavits detailing specific facts showing that a continuance is necessary, unless the court entertains an oral motion for continuance for good cause. (*Id*., subd. (a)(3).)

We review the juvenile court's denial of a continuance for abuse of discretion; discretion is abused when a decision is arbitrary, capricious or patently absurd and results in a manifest miscarriage of justice. (*In re D.Y.* (2018) 26 Cal.App.5th 1044, 1056.)

Father contends counsel had "learned new information about [f]ather's circumstances, namely, therapy between [f]ather and N.S. starting back in April 2023" and thus contends he demonstrated good cause for the court to grant "a short continuance to allow time to gather and review documentation concerning the therapy" that father and N.S. had participated in together. Father's position is that information about therapy that took place between father and N.S. may have had some effect on his argument that the beneficial parent-child relationship exception applied. We need not reach the merits of

10.

father's contention that the court abused its discretion by denying the continuance because the record directly contradicts father's counsel's representation that family sessions occurred in April 2023 and, therefore, any error is clearly harmless under any standard.**4**

The department reported in May 2023 that N.S.'s new therapist had her first session with her on April 20, 2023, and was *not* prepared at that time to start family sessions with father. Father testified at the 24-month review hearing on June 2, 2023, that N.S.'s previous therapist was going to include him in sessions but since N.S. got a new therapist, "It's been on hold a long time based on" there not being a CFT meeting to discuss father participating in N.S.'s therapy. When father was asked at the section 366.26 hearing, "did that therapy [family sessions to help N.S. and father interact] take place," he responded, "It didn't make it that far." While father's counsel indicated father had informed him family sessions had taken place in April 2023, father's own testimony directly contradicted this representation, and the other information on the record regarding N.S.'s mental health services belies any such representation that family sessions were occurring in April 2023. As such, we conclude beyond a reasonable doubt that father would not have obtained a more favorable outcome had the court granted the continuance. Any error in denying the continuance to obtain documentation on any sessions of family therapy taking place in April 2023, which apparently did not occur, was clearly harmless.

The court did not reversibly err by denying father's request for a continuance.

---

**4** Father has not contended the error was structural in nature nor has he explained how he was prejudiced by the denial.

## II. Denial of Father's Request to Apply the Beneficial Parent-Child Relationship Exception

At a section 366.26 hearing, when the juvenile court finds by clear and convincing evidence the child is adoptable, it is generally required to terminate parental rights and order the child be placed for adoption unless a statutory exception applies. (§ 366.26, subd. (c)(1).) One of the statutory exceptions is the beneficial parent-child relationship exception, which applies when "[t]he court finds a compelling reason for determining that termination would be detrimental to the child" where "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).)

The California Supreme Court has clarified in *In re Caden C.* (2021) 11 Cal.5th 614 (*Caden C.*) that there are three elements a parent has the burden to prove by a preponderance of the evidence to justify the application of the beneficial parent-child relationship exception: (1) "regular visitation and contact with the child, taking into account the extent of visitation permitted"; (2) "that the child has a substantial, positive, emotional attachment to the parent—the kind of attachment implying that the child would benefit from continuing the relationship"; and (3) "that terminating that attachment would be detrimental to the child even when balanced against the countervailing benefit of a new, adoptive home." (*Id*. at pp. 632–633, 636–637.)

In determining the second element—whether the children would benefit from continuing the relationship because the child has a substantial, emotional, positive attachment to the parent—the court may consider factors such as " '[t]he age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs,' " as well as "how children feel about, interact with, look to, or talk about their parents." (*Caden C.*, *supra*, 11 Cal.5th at p. 632.)

In determining the third element, courts look at "whether it would be harmful to the child to sever the relationship and choose adoption." (*Caden C.*, *supra*, 11 Cal.5th at p. 633.) Courts must "determine … how the child would be affected by losing the parental relationship—in effect, what life would be like for the child in an adoptive home without the parent in the child's life…. [¶] … That subtle, case-specific inquiry is what the statute asks courts to perform: does the benefit of placement in a new, adoptive home outweigh 'the harm [the child] would experience from the loss of [a] significant, positive, emotional relationship with [the parent?]' " (*Ibid*.) Courts may consider whether the child will experience effects such as "emotional instability and preoccupation leading to acting out, difficulties in school, insomnia, anxiety, or depression," as well as how a "new, stable home may alleviate the emotional instability and preoccupation leading to such problems, providing a new source of stability that could make the loss of a parent not, at least on balance, detrimental." (*Ibid*.)

We review the first two elements—whether the parents regularly and consistently visited and whether a beneficial relationship exists—for substantial evidence and the third element—whether "terminating that attachment would be detrimental to the child even when balanced against the countervailing benefit of a new, adoptive home"—for abuse of discretion. (*Caden C.*, *supra*, 11 Cal.5th at pp. 636, 639–641.) Under the substantial evidence standard of review, "a reviewing court should 'not reweigh the evidence, evaluate the credibility of witnesses, or resolve evidentiary conflicts.' [Citation.] The determinations should 'be upheld if … supported by substantial evidence, even though substantial evidence to the contrary also exists and the trial court might have reached a different result had it believed other evidence.' " (*Id*. at p. 640.) "Review for abuse of discretion is subtly different, focused not primarily on the evidence but the application of a legal standard. A court abuses its discretion only when ' " 'the trial court

13.

has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination.' " ' " (*Id*. at p. 641.)[5]

Here, the court concluded the severance of the parent-child relationship would not deprive N.S. of a substantial emotional attachment such that she would be greatly harmed, and determined that given the record it could not apply the beneficial parent-child relationship exception to termination of parental rights. Such a determination was supported by substantial evidence and was not an abuse of discretion.

First, we recognize father's efforts at working to develop a strong positive relationship with N.S. Father was consistent with visitation, made many efforts at reunification, and clearly wanted N.S. in his care. He did not, however, present evidence compelling the court to apply the beneficial parent-child relationship exception. His testimony established visits went well and that he thought N.S. loved him and mother. The juvenile court, in viewing this testimony in the context of the rest of the evidence presented, was not unreasonable in determining it could not apply the exception. N.S. was an infant when removed from the parents' care, and the short amount of time N.S. spent living with the parents were marked by substance abuse and domestic violence. N.S. and father did not have a documented bond at the outset of the case; their relationship was developed almost exclusively in the context of the dependency proceedings. Throughout the lengthy reunification period, N.S. had many documented struggles with visitation with the parents, resulting in mental health treatment tailored to helping her tolerate visits better. By the time of the section 366.26 hearing, it was observed that at times during visits, she did not appear excited to see the parents, did not

---

[5]     The *Caden C.* court explained " 'there likely will be no practical difference in application of the two standards,' " but "[a]t its core, the hybrid standard we now endorse simply embodies the principle that '[t]he statutory scheme does not authorize a reviewing court to substitute its own judgment as to what is in the child's best interests for the trial court's determination in that regard, reached pursuant to the statutory scheme's comprehensive and controlling provisions.' " (*Caden C.*, *supra*, 11 Cal.5th at p. 641.)

fully engage with them, would ask to go back to the care provider, or would not allow the parents to hold or hug her. These interactions do not support a finding of N.S. having a substantial positive emotional attachment to either parent.

Weighing against these considerations, N.S. clearly had a strong bond with her care provider, who was the only home she knew and was capable of caring for N.S.'s special medical needs and emotional well-being, and the evidence supported that N.S. would do well in her adoptive home even if her relationship with her parents were severed. While her care provider testified she felt N.S. would suffer detriment if the parents were completely cut out of N.S.'s life, no specific details were provided as to the basis of her opinion. In balancing the benefit of the stability and permanence N.S. would receive from being adopted by this care provider who she appeared to be reliant on for emotional support against any harm N.S. would suffer from severing her relationship with father, the court was reasonable in determining the benefits of adoption outweighed N.S.'s interest in her relationship with father.

Father suggests the juvenile court "applied the wrong legal standard" (italics omitted) by assessing whether he occupied a "parental role." Father relies primarily on *In re L.A.-O.* (2021) 73 Cal.App.5th 197 (*L.A.-O.*) to support his argument. *L.A.-O* does not assist father.

The court in *L.A.-O.* considered the appellant parents' argument that *Caden C.* "overruled lower appellate court decisions holding that a parent asserting the parental-benefit exception must show that he or she occupies a 'parental role.' " (*L.A.-O.*, *supra*, 73 Cal.App.5th at pp. 201–202.) The appellate court declined to make such a sweeping holding but did conclude under the facts of that case, remand was necessary. In arriving at its conclusion, the appellate court discussed thoroughly how the term "parental role" was ambiguous and that it thought it was "better not to use the words 'parental role' at all." (*Id*. at p. 211.) The court noted a "parental role" was defined by case law as a "list of 'nots' ": "It is not merely frequent and loving contact; it is not merely pleasant visits;

it is not being merely a friendly visitor; and it is not merely an emotional bond (as opposed to a significant, positive, emotional attachment)." (*Ibid*.) The court went on to note the list was "consistent with *Caden C*." but lamented that it "tells us nothing about the mysterious X factor that will boost the parent up from being merely a friendly visitor and into the requisite parental role." Rather, the court highlighted that the guidance given by *Caden C*. was only that the "X factor … must result in a 'substantial, positive, emotional attachment.' " (*L.A.-O.*, at p. 211.)

The *L.A.-O.* court noted the juvenile court's ruling was "terse" and that it only stated the parents had " 'not acted in a parental role in a long time' " whereas the prospective adoptive parents had been. (*Ibid*.) The appellate court acknowledged the juvenile court "may have meant that the children had a substantial, positive, emotional attachment to the prospective adoptive parents but not to the parents" and "[t]hat would be legally correct." (*Ibid*.) The court went on, "However, from its reference to a long time, it seems to have meant that they were not capable of taking custody, or had not been good parents, or had not been providing necessary parental care," which "would be erroneous." (*L.A.-O.*, at p. 212.) The court remanded the matter for reconsideration in light of *Caden C*.

Here, in contrast to the juvenile court in *L.A.-O.*, the juvenile court did not completely base its determination on a conclusion that father did not occupy a "parental role" without any other analysis. Rather, in reciting the relevant law on the beneficial parent-child relationship, among several other factors to consider, it stated, "That the parents must show that they occupy parental role, not just that of a visitor, even if it's a visitor that's loved." The court went on to list several specific factors set forth by *Caden C*. to assess whether a beneficial relationship existed and expressly applied those factors to the facts of the case, including the age of N.S., the positive or negative effect of the interaction between the parents and N.S., N.S.'s particular needs, and whether severing the parent-child relationship would deprive N.S. of a "substantial positive

16.

emotional attachment such that the child would be greatly harmed." While the *L.A.-O.* court cautioned against using the term "parental role," it held that it was permissible when it is meant to refer whether the child has a "substantial, positive, emotional attachment" to the parents. Here, unlike in *L.A.-O.*, there is nothing to suggest that the juvenile court was using the term to mean anything other than a "substantial, positive, emotional attachment." Rather, the court analyzed the facts of the case using specific factors set forth in *Caden C.* and expressly stated it was determining whether such an attachment existed. We do not find the court relied on any improper factors or applied the "wrong legal standard." The court was focused on the relationship between N.S. and the parents and whether the benefits of adoption outweighed the harm she would suffer, which is proper.

Father also contends the juvenile court "applied the wrong legal standard when concluding N.S.'s adoption by a relative would afford N.S. postadoption contact with [f]ather." (Italics omitted.) Father's argument is based on the court saying to the parents, after making its findings, "Now, from what I can see, it sounds very much like this child is loved by everybody. And because the child is being adopted by family, I don't for one moment believe that [N.S.] is not going to have you in her life."

The agency does not dispute that "the court may not consider whether visits are likely to occur in the future in order to discount the parent's assertion of the [beneficial parent-child relationship] exception." Rather, it contends the juvenile court did not do so in the present case. The agency points out that no evidence was introduced that postadoption contact would occur and that father's counsel argued the court could not consider the possibility of postadoption contact. The agency further maintains that the context of the court's comment within its larger ruling made it clear it was not relying on postadoption contact. The agency states in its respondent's brief, "The [c]ourt went through its analysis of the criteria for determining the applicability of the exception. It set forth a list, with citations to various cases. [Citation.] The [c]ourt then reiterated that

there was no question that the minor was adoptable, by 'more' than clear and convincing evidence. It then made a factual analysis of some of the elements. Finally, it found, '[t]he preference for adoption is there. So, at this particular time, the law requires me to follow the recommendation of the [a]gency.' " The agency went on, "It was only after this statement and in view of a mother who had reportedly been crying throughout the proceedings [citation] that the [c]ourt attempted to soften the blow to the parents a bit" by making the statement now challenged by father.

We agree with the agency's interpretation of the juvenile court's comments and do not find it applied the wrong legal standard or improperly relied on potential postadoption contact in making its determination the beneficial parent-child relationship exception did not apply.

For the foregoing reasons, we conclude the court did not err by determining the beneficial parent-child relationship exception did not apply.

## DISPOSITION

The juvenile court's order terminating parental rights is affirmed.